IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| CRAIG McMURRY, | | 4:16-cv-467-JAJ-HCA |
| Plaintiff, | | |
| vs. | | |
| NANCY A. BERRYHILL, Acting Commissioner of Social Security,[1] | | REPORT AND RECOMMENDATION (FILED UNDER SEAL) |
| Defendant. | | |

Plaintiff Craig McMurry seeks review of the Social Security Commissioner's decision denying his application for disability benefits ("DIB") under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 401-34. This Court reviews the Commissioner's final decision pursuant to 42 U.S.C. § 405(g). The case is before the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). The Court considers this matter fully submitted on the briefs.

## I.    PROCEDURAL AND FACTUAL BACKGROUND

On April 24, 2013, Mr. McMurry applied for disability benefits alleging an onset date of January 21, 2013. (Tr. at 190). The Social Security Administration ("SSA") denied McMurry's claim on September 5, 2013 (*id.* at 124-27) and again upon reconsideration on December 4, 2013. (*Id.* at 131-39). Administrative Law Judge ("ALJ") Eric S. Basse granted McMurry's hearing request and held a hearing on February 26, 2015. (*Id.* at 43-96). Mr. McMurry appeared with

---

[1] Nancy A. Berryhill, became the Acting Commissioner of Social Security on January 23, 2017. Pursuant to Federal Rule of Civil Procedure 25(d), she is substituted for Carolyn Colvin as Defendant in this suit, which may continue without further action. *See* 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

attorney Gretchen Johnson and vocational expert Carmen Mitchell. On May 27, 2015, the ALJ issued an unfavorable decision, finding Mr. McMurry was not disabled. (*Id.* at 15-42). Mr. McMurry requested a review of the ALJ's decision. The Appeals Council denied the request for review and the ALJ's decision became a final decision on July 2, 2016. (*Id.* at 1-3). Mr. McMurry timely filed the Complaint [1] in this case on August 19, 2016.

### A. Educational and Vocational Factors

Mr. McMurry was 51 years old when he filed for benefits. (Tr. at 190). He had past relevant work as a heavy equipment operator for the Wayne County Secondary Road Department and as a sales clerk at a lumber and hardware store. (*Id.* at 76-77, 249). His highest level of education was 11th grade. (*Id.* at 47).

### B. Medical Evidence

On January 21, 2013, Mr. McMurry was injured in a single car motor vehicle accident after he drove off the road to avoid hitting some deer and ran into a tree. (Tr. at 340). He was initially taken to Wayne County Hospital and then transported to Mercy Medical Center in Des Moines when his vital signs started to drop and he developed increased tenderness in the abdominal region. (*Id.* at 340-41). X-rays of his thoracic spine showed vertebral body fractures at T9, T10, T12, and L1. The T9 vertebral fracture was comminuted with less than 50% loss of vertebral body height; there was a superior endplate fracture at T10 without loss of vertebral body height and a spinous process fracture also at T10; and superior endplate fracture at T12 with subtle loss of central vertebral body heights. L1 showed vertebral body fracture with loss of vertebral body height anteriorly and subtle bony retropulsion at L1. (*Id*. at 345).

At Mercy, the thoracic spine x-ray findings were confirmed. (Tr. at 598). A CT scan of the head showed no acute conditions and CT of the C-spine showed no evidence of fractures or acute

abnormalities. Abdominal, pelvis, and chest x-rays were non-acute. (*Id.*). CT of abdomen and pelvis did show anterior wedge depression deformity of T10, T12, and L1 vertebral bodies and nondisplaced rib fractures left posterior tenth and right eighth ribs. (*Id.*) Mr. McMurry had a history of extensive alcohol abuse, so he was placed on CIWA precautions for prevention of alcohol withdrawal while he was at Mercy. (*Id.* at 599). Mr. McMurry was placed in a TLSO brace and he and his wife were instructed he must wear the brace at all times when out of bed. (*Id.* at 591). Physical therapy and occupational therapy were initiated after McMurry complained of left shoulder and arm pain, even though x-rays of the arm were negative. (*Id.*) McMurry experienced alcohol withdrawal, including hallucinations and confusion. (*Id.*) On January 29, 2013, Mr. McMurry was discharged home with the TLSO brace and instructions to avoid alcohol. (*Id.*)

On February 5, 2013, Mr. McMurry returned to the Mercy Neurosurgery clinic for follow-up. He complained of continued significant lower thoracic and lumbar pain and was taking Vicodin and Valium for the pain without significant relief. (Tr. at 561). On physical examination, Mr. McMurry was wearing the TLSO appropriately and could ambulate without assistance. (*Id.* at 562). Review of his x-rays showed no significant worsening of the T9 and L1 moderate compression fracture and the milder compression fractures at T10 and T12 appeared stable. (*Id.*) Mr. McMurry was to continue using the TLSO brace; discontinue usage of Vicodin and Valium and replace with Percocet and Flexeril. (*Id.* at 563).

On February 7, 2013, Mr. McMurry saw his local physician, Dr. Douglas Hoch, with complaints of hypotension, lethargy, dehydration, and hyperglycemia following the accident. (Tr. at 365-66, 459). He was admitted to acute care at Wayne County Hospital for rehydration and management of his Type I diabetes mellitus. (*Id.* at 365-66, 459). He was discharged to the care of his wife on February 9, 2013, on an altered medication regimen. (*Id.* at 357).

On February 27, 2013, Mr. McMurry visited Dr. Hoch to follow up after his hospitalization for diabetes management. (Tr. at 462-64). Mr. McMurry reported a good appetite and had gained ten pounds since his hospital discharge. (*Id.*) Dr. Hoch advised McMurry to increase his bedtime dose of Lantus Insulin to help with morning blood sugars. (*Id.* at 464).

Dr. Robert Hirschl, the neurosurgeon, followed up with McMurry on March 1, 2013. (Tr. at 558). McMurry indicated that his back pain was improving, except the brace irritated him. (*Id.*). On physical examination, Dr. Hirschl noted no tenderness to palpation of the spine except in the upper thoracic region where the brace made contact – Mr. McMurry's skin was red and irritated at this site. Mr. McMurry was able to flex and extend without additional discomfort and was grossly neurologically intact. (*Id.* at 559). Dr. Hirschl wanted to start weaning Mr. McMurry out of the TLSO brace and continued restrictions, such as no "varus" exercise and no heavy lifting no more than 15 pounds. (*Id.* at 560). Mr. McMurry wanted to go back to work and Dr. Hirschl told him so long as he could abide by his restrictions and felt comfortable sitting in a truck he thought it was okay to try to go back to work. (*Id.*) Dr. Hirschl also restricted Mr. McMurry from  repetitive lifting, kneeling, pulling, pushing, twisting, bending, or stooping. (*Id.* at 574).

Mr. McMurry saw Dr. Hoch again on March 28, 2013, to follow up on his diabetes and his hospitalization for thoracic spine compression fractures. (Tr. at 465-68). Mr. McMurry reported that he was checking his blood sugars several times daily and that they were poorly controlled. (*Id.* at 465). Mr. McMurry also reported ongoing mid-back pain and that he was compliant with taking his medications. (*Id.*). On physical examination, Dr. Hoch noted gibbous deformity lower dorsal spine and tenderness to palpation on the spinous process; no foot deformities; and Mr. McMurray had a normal gait and was able to stand without difficulty. (*Id.* at 467).

On April 11, 2013, Mr. McMurry saw Dr. Hirschl at Mercy Neurosurgery. (Tr. at 555-57). McMurry reported continued back pain, had been out of his brace since his last visit, and had trouble standing or walking any distance due to pain. (*Id.* at 555). Mr. McMurry felt better lying down. (*Id.*) On physical examination, Dr. Hirschl noted Mr. McMurry's gait and station were within normal limits; his joints, bones, and muscles were normal; and his range of motion was within normal limits. (*Id.* at 556). Dr. Hirschl discussed treatment options with Mr. McMurry, noting he had multiple compression fractures that had resulted in kyphotic deformity. (*Id.* at 557). Mr. McMurry did not want surgery and was not interested in physical therapy or other conservative therapy for his pain. (*Id.*) Dr. Hirschl told Mr. McMurry that even with back surgery he may need chronic pain management. Mr. McMurry wanted to go back to work and Dr. Hirschl advised he should be mindful of his back and not do heavy lifting. (*Id.*) Dr. Hirschl released McMurry to return to work with no noted restrictions as of April 15, 2013. (*Id.* at 573).

On April 29, 2013 Dana Simon, M.D. saw Mr. McMurry at the Mercy Center for Pain Medicine. (Tr. at 390-393). Dr. Hirschl referred him. (*Id.* at 390). McMurry reported pain in his midback to lowback and left shoulder pain. Mr. McMurry advised he was seeking alcohol addiction help and was going through a rehabilitation program in Osceola. (*Id.*) On physical examination, Mr. McMurry's muscle tone appeared to be diminished to normal in the lower back and over the sacroiliac regions. There was no significant asymmetry of the sacroiliac joints on examination and McMurry's straight leg raising was normal, as was his gait. (*Id.* at 391). The muscles individually appeared tender or unusually painful or uncomfortable to palpation with rigidity on the bilateral spine. (*Id.*) Dr. Simon recommended Dr. Hoch consider continuing muscle relaxation for Mr. McMurry and "an occasional hydrocodone (dispensed and controlled by his wife) in the short-term," but primarily recommended warm water pool program with gentle PT in

the pool. (*Id.* at 392). Dr. Simon also recommended an epidural steroid injection in the next week at the L2 level. (*Id.*)

Mr. McMurry returned to the Mercy Pain Center on May 2, 2013, where Dr. Simon administered the epidural steroid injection at L2-L3. (Tr. at 388-89).

On May 9, 2013, Mr. McMurry saw Dr. Hoch for follow-up of his diabetes and chronic back pain. (Tr. at 469-72). Mr. McMurry reported he had not been compliant with his medications and he also reported ongoing back pain and left shoulder pain. (*Id.* at 469). On physical examination, Dr. Hoch noted tenderness in the left bicipital notch with slight reduction internal rotation left shoulder, but no crepitus or effusion and abduction to 100 degrees. (*Id.* at 471). McMurry's spine was tender to palpation on the lower dorsal spine. (*Id.*) Dr. Hoch administered a tendon sheath injection in the left biceps and increased Mr. McMurry's diabetic medications. (*Id.* at 471).

On June 7, 2013, Mr. Murry saw Dr. Simon at the Mercy Center for Pain Medicine. (Tr. at 654-56). Mr. McMurry complained of mid-back pain and left shoulder pain. He advised that an epidural injection in his back on May 2, 2013 helped for only four days. (*Id.* at 655). Mr. McMurry reported the standing position was worse and he could not stand more than an hour. (*Id.*) He did report he felt a little better. (*Id.*) On physical examination, Dr. Simon noted muscle tone appeared to be diminished to normal in the lower back and over the sacroiliac regions with no significant asymmetry of the sacroiliac joints. Mr. McMurry's straight leg raising and gait were normal and there was not an apparent antalgic gait. (*Id.* at 656). Although his muscles individually did not appear tender or unusually painful or uncomfortable to palpation, Mr. McMurry had mild pain in the lower thoracic and upper lumbar area deep in the area, but not to palpation. (*Id.*) Dr. Simon noted they could consider repeat epidural injection, but Mr. McMurry was hesitant. Dr. Simon

recommended ongoing medication per Dr. Hoch in tapering doses as needed and noted that the pain in most patients would resolve in three to six months. Dr. Simon noted Mr. McMurry had no apparent spinal compromise of an acute nature. (*Id.*)

Mr. McMurry had another follow-up visit with Dr. Hoch on July 15, 2013. (Tr. at 517-20). McMurry reported ongoing back pain and left shoulder pain. He was checking his blood sugars infrequently and had not been compliant with his diabetes medications. (*Id.* at 517). On physical examination, Mr. McMurry's spine was tender to palpation on the lower dorsal spinous processes and he demonstrated tenderness in the left bicipital notch with moderate reduction internal rotation and abduction of his left shoulder, which he could abduct to 80 degrees. (*Id.* at 519). X-rays of his left shoulder showed normal findings. (*Id.*) Dr. Hoch referred Mr. McMurry to physical therapy for his left shoulder pain, noting he was not a good surgical candidate. (*Id.* at 520). Dr. Hoch increased Mr. McMurry's diabetic medications, noting whether he would take as directed was uncertain. (*Id.*) Dr. Hoch switched the pain prescription to Oxycontin in place of hydrocodone for better, longer-lasting pain control. Mr. McMurry's wife was to call in a month and they would decide whether to renew the prescription or increase the dose. (*Id.*)

On September 29, 2013, Mr. McMurry was hospitalized with diabetic ketoacidosis and dehydration. (Tr. at 482-83). He had stopped his Lantus insulin to save money and had been trying to control his diabetes with Humalog insulin on a PRN basis. (*Id.* at 482). McMurry was started on IV insulin infusion, IV fluids, and admitted to intensive care for monitoring. (*Id.*) During his hospitalization his blood sugars returned to normal range and he was started back on long-acting basal insulin and meal time insulin. (*Id.* at 483). McMurry was discharged to home on October 1, 2013, with Dr. Hoch noting they would try to get patient assistance for insulin and testing supplies. (*Id.*)

Dr. Hoch saw Mr. McMurry on October 10, 2013, to follow up his diabetes and chronic back pain. (Tr. at 526-29). Mr. McMurry reported he was compliant with taking his medications as directed and was taking six oxycodone daily for pain control. (*Id.*) He got a flu shot and was to continue his medications and treatments. (*Id.* at 528-29).

Mr. McMurry returned to see Dr. Hoch on December 12, 2013, to follow up on his diabetes and chronic back pain. (Tr. at 630-33). McMurry reported he was doing much better and was compliant with his insulin, although he had run out of simvastatin two months before. (*Id.* at 630). Dr. Hoch continued Mr. McMurry's current medications, "commended him" on his improved diabetic control, and restarted his prescription for simvastatin. (*Id.* at 633).

On March 11, 2014, Mr. McMurry saw Dr. Hoch for follow-up of his diabetes and chronic back pain. (Tr. at 634-37). Mr. McMurry reported he was having more pain in his back and shoulders and was taking six oxycodone daily. (*Id.* at 634). He was compliant with his diabetes medications. (*Id.*) On physical examination, McMurry could abduct his right shoulder to 95 degrees with moderate limitation of internal rotation; he could abduct his left shoulder to 100 degrees, internal rotation slightly limited. (*Id.* at 636). Dr. Hoch noted treatment options for Mr. McMurry's pain were limited due to lack of insurance coverage. (*Id.* at 637). Dr. Hoch switched Mr. McMurry's Lantus dosage to mornings and gave permission for McMurry to take up to eight oxycodone daily. (*Id.* at 637).

On March 25, 2014, Dr. Hoch provided a medical statement concerning Mr. McMurry's diagnoses and care. (Tr. at 530). Dr. Hoch stated that since the motor vehicle accident Mr. McMurry had been unable to work and remained totally disabled, which Dr. Hoch did not expect to change in the future. (*Id.*)

Mr. McMurry saw Dr. Hoch on April 1, 2014, for follow up care, including a report of visual problems and increased mid-back pain. (Tr. at 638-40). Mr. McMurry reported taking 8 Percocet daily for his back pain. (*Id.* at 639). On physical examination, his pupils were equal, round and reactive to light and accommodation bilaterally, with normal EOM's. (*Id.* at 639). Dr. Hoch had a lengthy conversation with Mr. McMurry about the purpose of insulins and they agreed on a dosage schedule with the purpose of blood sugar control that did not result in hypoglycemia. (*Id.* at 640). Mr. McMurry was to continue annual eye exams. (*Id.*)

At a June 12, 2014 visit to Dr. Hoch, Mr. McMurry reported he was having more right shoulder pain, the left was doing better, and he had been compliant with taking his medications. (Tr. at 641-44). On physical examination, Mr. McMurry could abduct his right shoulder to 95 degrees with moderate limitation of internal rotation. (*Id.* at 643). Dr. Hoch administered a right subacromial injection of Kenalog. (*Id.*)  Dr. Hoch again commended Mr. McMurry on the improvement in his diabetic control and discontinued a prescription for Lisinopril for low blood pressure. (*Id.* at 644).

On September 12, 2014, Mr. McMurry saw Dr. Hoch in follow up. (Tr. at 645-48).  Mr. McMurry reported he was doing well, had no current complaints, and was compliant with taking his medications. (*Id.*at 645). Dr. Hoch adjusted Mr. McMurry's Lantus medication and administered a flu shot. (*Id.* at 648).

On November 29, 2014, Mr. McMurry was seen at the emergency room at the Knoxville Hospital with a diagnosis of diabetic hypoglycemia with diabetes mellitus type 1. (Tr. at 549-52). Mr. McMurry's wife found him slumped over in the passenger seat of their car in the Wal-Mart parking lot when she returned from shopping at Wal-Mart. (*Id.* at 549). Hospital staff assisted McMurry as he was nonresponsive. (*Id.*)  He remained unresponsive until two amps of glucagon

were given. (*Id.* at 551). After 20 minutes he began to respond and to return to normal cognitive function. (*Id.*) Hospital staff observed McMurry and gave him drink and food when his condition improved. (*Id.*) ER staff discharged McMurry home, to follow up with his primary care physician. (*Id.*)

Mr. McMurry saw Dr. Hoch on December 1, 2014. (Tr. at 649-51). He had no further hypoglycemic episodes after the emergency room visit. (*Id.* at 649). Dr. Hoch did not recommend any insulin adjustments, but gave Mr. McMurry a prescription for a Glucagon emergency kit for use PRN. (*Id.* at 651).

On December 18, 2014, Mr. McMurry visited Dr. Hoch for completion of his Iowa Health and Wellness annual physical examination. (Tr. at 683-86). Mr. McMurry expressed no concerns and no symptoms. (*Id.* at 683). Adacel and pneumovax vaccines were administered and the Health Risk Assessment form completed. (*Id.* at 686).

Dr. Hoch examined Mr. McMurry saw Dr. Hoch on January 22, 2015. (Tr. at 688-91). McMurry primarily wanted to discuss his pain medications. (*Id.* at 688). He described bilateral lower back pain that was severe, constant in nature, and sharp and aching in quality. (*Id.*) The pain did not radiate. Mr. McMurry also complained of pain in his right lateral hip. (*Id.*) He had no leg weakness or numbness and no urinary or bowel incontinence. (*Id.*) Mr. McMurry reported he was taking six oxycodone a day for pain but it was not effective. He also was taking gabapentin three times a day for peripheral neuropathic pain and four ibuprofen tablets daily. (*Id.*) On physical examination, Mr. McMurry's spine demonstrated tenderness to palpation/percussion over the lower lumbar spinous processes and the L-S junction, but had normal range of motion. Mr. McMurry was tender over the greater trochanter of his right lower extremity and straight leg raising was negative to 90 degrees. (*Id.* at 689-90). He had normal gait and normal station. (*Id.* at 690).

Dr. Hoch ordered a lumbosacral series of AP and lateral x-rays, diagnosed trochanteric bursitis of the right hip, and administered an injection in the trochanteric bursa of the right hip. (*Id.*) Dr. Hoch discontinued the oxycodone prescription and prescribed Oxycontin to be taken once every 12 hours, and meloxicam to be taken once a day, both for pain control. (*Id.* at 690-91).

Dr. Hoch completed a work capacity form for the Social Security Administration on February 17, 2015. (Tr. at 696-97). Dr. Hoch agreed that: Mr. McMurry was capable of lifting and/or carrying 20 pounds occasionally; lifting and/or carrying 10 pounds frequently; standing and/or walking (with normal breaks) 6 hours in an 8 hour workday; sitting (with normal breaks) 6 hours in an 8 hour workday; occasionally climbing, stooping, kneeling, crouching or crawling, and continuously reaching, handling, fingering, and feeling. (*Id.* at 696). On the portion of the form that requested more narrative answers, Dr. Hoch stated Mr. McMurry had been a patient for 25 years and referred the SSA to his records for information regarding his medical condition, course of treatment, and prognosis. (*Id.* at 697). He stated Mr. McMurry was not always compliant with prescribed treatment. (*Id.*) He did not think Mr. McMurry was capable of performing any job on a sustained basis in a routine work setting, but did not explain further. Dr. Hoch expected Mr. McMurry would need to take frequent unscheduled breaks of 10 to15 minutes to sit or lie down to reduce pain, again without further explanation. (*Id.*) He agreed that Mr. McMurry needed to abide by a 15-pound lifting restriction the neurosurgeon previously recommended. (*Id.*) Dr. Hoch reported Mr. McMurry had a history of alcohol abuse, but did not specifically have a current diagnosis of alcohol abuse. (*Id.*) Finally, Dr. Hoch expected Mr. McMurry would likely have "bad days" where his physical condition would make him absent for work or cause him to leave before end of shift, but did not estimate how often that might occur. (*Id.*)

In a February 27, 2015 work capacity form, Dr. Hoch responded differently. (Tr. at 325). He disagreed that Mr. McMurry could lift or carry 20 pounds occasionally and indicated he could lift 10 pounds based on the neurosurgeon's recommendations. (*Id.*) Dr. Hoch agreed Mr. McMurry could lift or carry 10 pounds frequently. (*Id.*) He disagreed that Mr. McMurry could stand or walk six hours in an eight hour workday and estimated he could stand/walk at least two hours with breaks as Mr. McMurry's back pain increased when he was on his feet. (*Id.*) Dr. Hoch further agreed Mr. McMurry could sit (with normal breaks) six hours in an eight hour workday, could occasionally climb, stoop, kneel, crouch, or crawl, and could continuously reach, handle, finger, and feel. (*Id.*)

In response to a Personal Pain/Fatigue Questionnaire from the SSA dated May 20, 2013, Mr. McMurry described constant severe back pain from the middle of his back to his lower back, left shoulder, left ribs, and sharp and aching pain in his right hip. (Tr. at 261). He noted he changed his position frequently. (*Id.*) Mr. McMurry said he had been discharged from physical therapy because of insurance. (*Id.* at 262). He had to stop activities such as working, hunting, fishing, and walking. (*Id.*) He could only sleep four hours at a time. (*Id.*) Mr. McMurry indicated he needed help getting in the shower and could not walk very far. (*Id.* at 263). He could lift 15 pounds, but could not reach very far or for very long. (*Id.*) On a typical day, Mr. McMurry said he watched TV, played games on the Kindle, and did physical therapy exercises.

In response to an Adult Function Report dated May 21, 2013, Mr. McMurry confirmed his daily activity. (Tr. at 265). He said he needed help putting on socks and getting into the shower. (*Id.* at 265-66). He needed help getting the right medication at the right time. (*Id.* at 266). Mr. McMurry said he could not prepare his own meals, but could warm up leftovers in the microwave. He tried to fold clothes once a week, but it took him all day. (*Id.*) He did not have a valid driver's

license and his wife did all the shopping. (*Id.* at 267). He could handle money and pay bills. (*Id.*) He had not been hunting or fishing since his accident, but watched TV and played games on the Kindle daily. Mr. McMurry visited with others in person and on the phone daily, would go to doctor's appointments or with his wife to run errands once a week, and attended AA every two weeks. (*Id.* at 268). He estimated he could walk 100 yards, but would have to rest 10 minutes. (*Id.* at 269). He could pay attention 20 to 30 minutes, did not follow written or spoken instructions well, and did not get along with authority figures (the police because he was mad due to his OWI charge). (*Id.* at 269-70). At the time he completed the Function Report he was using a back brace and had glasses. (*Id.* at 270). His wife completed the Function Report for him. (*Id.* at 271).

Two state agency consultants conducted reviews of Mr. McMurry's medical records. (Tr. at 98-109; 110-22). The first examiner, Dr. Jan Hunter, D.O., reviewed medical records through August 25, 2013. (*Id.* at 100). The examiner noted Mr. McMurry was in the recovery period, but continued to slowly improve; therefore, the examiner anticipated Mr. McMurry would be capable of performing at the recommended RFC within a twelve-month period. (*Id.* at 107). Specifically, the examiner concluded Mr. McMurry could occasionally lift or carry 20 pounds; frequently lift or carry 10 pounds; stand or walk about six hours in an eight-hour workday; sit about six hours in an eight-hour workday; push or pull on an unlimited basis, other than shown, for lift or carry; could occasionally climb ramps/stairs, ladders/ropes/scaffolds, balance, stoop, kneel, crouch and crawl. (*Id.* at 105-06). The examiner found Mr. McMurry had no manipulative, visual, communicative, or environmental limitations. (*Id.* at 106).

The second examiner, Dr. John May, M.D., reviewed on reconsideration Mr. McMurry's medical records up to December 3, 2013. Dr. May noted, in addition to the findings of the previous examiner, that Mr. McMurry had been hospitalized for diabetic ketoacidosis and dehydration after

stopping his Lantus insulin to save money. (Tr. at 120). Dr. May believed the initial assessment of RFC was accurate and was no longer a duration RFC. (*Id.*)

### C. Hearing Testimony

At the hearing on February 26, 2015, Mr. McMurry confirmed he had completed the eleventh grade, but had not obtained a GED. (Tr. at 47). He had not worked since January 2013. (*Id.* at 48-49).

In response to questions about his hip pain, Mr. McMurry testified it was "real bad" on his right hip and his left hip was starting to get a "little bit of pain in it." (Tr. at 50). The ALJ discussed Mr. McMurry's diabetes: Mr. McMurry testified he was complying with his medications. (*Id.* at 51). He testified his doctor said he had only about 10% feeling in his nerves in his feet and his vision got blurry when his sugar got high. (*Id.*) He testified his A1C averaged about 10. (*Id.* at 52).

To treat the pain his hip, Mr. McMurry testified he had received a steroid shot and might do some stretching exercises in the mornings. (Tr. at 52, 55). McMurry also took pain medication, but reported that was for his back pain not his hip pain. (*Id.* at 52, 54-55). He testified he could not sit for long and his pain medicine made him tired, so he had to take a nap most of the time. (*Id.* at 53). An imaging study showed hip joint spurring. (*Id.* at 55).

The ALJ asked Mr. McMurry about the problem with his shoulder. (Tr. at 53). Mr. McMurry testified the left shoulder sustained a rotator cuff tear for which he had received steroid shots a couple of times. (*Id.*) He could reach to head level and the shoulder was tender. (*Id.*) McMurry indicated he experienced pain when he put his coat on and off because he had to extend the shoulder out completely. (*Id.* at 54). Mr. McMurry is right handed. (*Id.*)

Mr. McMurry testified he had not had alcohol since January 2013. (Tr. at 54).

With respect to his hobbies, Mr. McMurry liked to go fishing, but had not gone fishing for at least ten years. (Tr. at 55-56).

Describing the pain in his back, Mr. McMurry testified the pain in his lower back was probably the worst. (Tr. at 57). He had to switch recliners every 15 minutes. (*Id.*) To travel in a car he had to move his seat into different positions to get pressure off his back. (*Id.*) Mr. McMurry testified he spent most of his time in his recliners and could not walk outside, even to his garage which is 30 to 40 feet away, but he also estimated he could walk 70 to 100 feet. (*Id.* at 58, 60). He described the pain in his back as similar to flexing a muscle for a long period of time causing muscle cramps. There were days it felt like a knife poking him in his spine. (*Id.*) Mr. McMurry stated he could stand in one place about 15 minutes and sit no more than 30 minutes in an office chair. (*Id.* at 60). The ALJ noted Mr. McMurry had gotten up twice during the hearing to stand a little. (*Id.*) Mr. McMurry testified he was restricted to lifting no more than 15 pounds. (*Id.* at 61). If he does, his back cramps up. (*Id.*) If he does laundry he tries to scoot the laundry basket without lifting or folds clothes at the dryer. (*Id.*) When his pain flares from activity, it lasts until he takes his nighttime pain pill. (*Id.* at 62). He cannot work in heavy equipment as he could not sit with the jarring back and forth. (*Id.*)

Mr. McMurry testified there are three to four days a week when the pain is worse than his normal baseline pain. (Tr. at 62-63). On those days he will walk around a little and move from chair to chair. (*Id.* at 63). Although he told Dr. Hirschl he wanted to go back to work and Dr. Hirschl did release him, Mr. McMurry did not return to work. (*Id.*) He naps almost daily because of the pain medication, which does not take his pain away, only brings it down a little. (*Id.* at 64). Mr. McMurry does not believe there is anything more the doctors can do for pain management, even with surgery. (*Id.*at 65). Dr. Hirschl, the neurosurgeon, is the doctor who put Mr. McMurry

on the 15-pound lifting restriction. (*Id.* at 66). Mr. McMurry no longer uses a back brace. (*Id.* at 67).

In response to questions by his attorney, Mr. McMurry testified he could not stand too long, and could not lift without his back tightening up and pain increasing. (Tr. at 68-69). He does not sleep the entire night, maybe two hours at a time. Mr. McMurry will get up and walk around for maybe an hour and then go back to sleep for another two hours. (*Id.*at 70).

Mr. McMurry sees Dr. Hoch about every three months. (Tr. at 71). Dr. Hoch monitors his diabetes and has given him injections for his shoulder and hip. (*Id.*) Explaining his latest incident of hypoglycemia in November, Mr. McMurry testified he took his insulin, but did not eat anything at noon after which he passed out in the car. (*Id.* at 74-75). He now has glucose tablets he carries with him plus his shots. (*Id.* at 75).

The ALJ discussed Mr. McMurry's work experience with him. Mr. McMurry operated a motor grader for ten years and ran a crane. (Tr. at 76). He also worked as a sales attendant at a small town lumber yard. (*Id.* at 76-77).

The vocational expert (VE), Carma Mitchell, responded to hypotheticals from the ALJ. In response to a hypothetical of an individual of claimant's age and work experience, capable of light work as defined in the DOT with occasional climbing, balancing, stooping, kneeling, crouching, and crawling, she testified McMurry could not return to his past work, but there were some light equipment operator jobs including form grader and road roller, operator. (Tr. at 79). For unskilled jobs there would be light bagger, marker, and sales attendant. (*Id.* at 80-81).

Taking the first hypothetical and adding in no overhead reaching with the left non-dominant upper extremity, the VE testified there were no past jobs available and no jobs that would

require the person to pull themselves up into equipment and climb ladders. (Tr. at 81). The unskilled jobs previously described would be available. (*Id.*)

Finally, the ALJ changed the hypothetical to sedentary work and there were no skills transferrable to sedentary jobs. (Tr. at 82).

Returning to Hypothetical 1 and adding in the person needing to lay down or take an unscheduled rest break for 10 or 15 minutes every two hours, there would be no jobs available. (Tr. at 82-83). With a lifting restriction of 10 to 15 pounds, the VE believed a person could operate light equipment vehicles. (*Id.* at 84).

In response to questions by McMurry's counsel, the VE testified that at least two extra 10 or 15 minutes breaks in the schedule would not be tolerated. (Tr. at 85). With a 10 to 15-pound lifting restriction the number of jobs would be reduced and it would not allow for the full range of light work. (*Id.*) The VE opined that in a light work scenario where an individual would need to sit 5 to 10 minutes every half hour to take a break, the employer would not tolerate those breaks, nor tolerate two to three absences per month consistently. (*Id.* at 86).

The VE clarified that the light jobs she gave would all require frequent reaching. (Tr. at 91). The jobs operating equipment would require frequent or continuous pushing and pulling. (*Id.*)

Mr. McMurry no longer has a driver's license. (Tr. at 94) His wife drove him to the hearing. (*Id.*) He felt the bumps during the ride and it hurt, causing him to move in his seat several times. (*Id.* at 95).

## II.    FINDINGS OF THE COMMISSIONER

In order to qualify for benefits under the Act, Mr. McMurry must be disabled. "Disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has

lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). The Commissioner uses the following five-step evaluation to determine whether a claimant is disabled within the meaning of the Act and therefore eligible for disability benefits: "whether the claimant is (1) currently employed and (2) severely impaired; (3) whether the impairment is or approximates a listed impairment; (4) whether the claimant can perform past relevant work; and if not, (5) whether the claimant can perform any other kind of work." *Byes v. Astrue*, 687 F.3d 913, 915 n.2 (8th Cir. 2012)(quoting *King v. Astrue*, 564 F.3d 978, 979 n.2 (8th Cir. 2009)). If at step (4) the ALJ makes a finding that a claimant is unable to perform his/her past relevant work, the burden shifts to the Commissioner to prove with medical evidence the claimant "has a residual functional capacity to do other kinds of work, and that other work exists in significant numbers that [claimant] can perform." *Nalley v. Apfel*, 100 F. Supp. 2d 947, 952-53 (S.D. Iowa 2000)(citing cases).

Following the requisite five-step evaluation, the ALJ issued the written decision at issue in this case on May 27, 2015 and made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2018.

2. The claimant has not engaged in substantial gainful activity since January 21, 2013, the alleged onset date (20 C.F.R. 404.1571 *et seq.*).

3. The claimant has the following severe impairments: residuals of motor vehicle accident to include T9, T10, and L1 vertebral fractures; diabetes mellitus with (mild) peripheral neuropathy; and (mild) hip bursitis (20 C.F.R. 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as

defined in 20 C.F.R. 404.1567(b) except he should no more than occasionally climb, balance, stoop, kneel, crouch, or crawl.

6.      The claimant is unable to perform any past relevant work. (20 C.F.R. 404.1565).

7.      The claimant was born on November 14, 1961 and was 51 years old on the alleged disability onset date which is defined in the regulations as an individual 'closely approaching advanced age' (20 C.F.R. 404.1563). There has been no change in age category to date.

8.      The claimant has a limited education and is able to communicate in English (20 C.F.R. 404.1564).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (*See* SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. 404.1569 and 404.1569(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from January 21, 2013, through the date of this decision (20 C.F.R. 404.1520(g)).

(Tr. at 20-37).

## III.    STANDARD OF REVIEW

This Court "will affirm the ALJ's findings if supported by substantial evidence on the record as a whole." *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011)(quoting *Medhaug v. Astrue*, 578 F.3d 805, 813 (8th Cir. 2009)); *see also Kamann v. Colvin*, 721 F.3d 945, 950 (8th Cir. 2013); *Young v. Astrue*, 702 F.3d 489, 491 (8th Cir. 2013); 42 U.S.C. § 405(g)("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").

> Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion. To determine whether substantial evidence supports the decision, we must consider evidence that both supports and detracts from the decision. If substantial evidence supports the ALJ's decision, we will not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because we would have decided differently.

*Wildman v. Astrue*, 596 F.3d 959, 963-64 (8th Cir. 2010)(internal citations and quotation marks omitted); *see Phillips v. Colvin*, 721 F.3d 632, 625 (8th Cir. 2013); *Kamann*, 721 F.3d at 950; *Young*, 702 F.3d at 491. The Court should not overturn an ALJ's decision so long as the decision "falls within the available zone of choice." *Buckner v. Astrue*, 646 F.3d 549, 556 (8th Cir. 2011); *Heino v. Astrue*, 578 F.3d 873, 879 (8th Cir. 2009)(quoting *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008)). "The ALJ's decision 'is not outside the zone of choice simply because [the Court] might have reached a different conclusion had [the Court] been the initial finder of fact.'" *Heino v. Astrue*, 578 F.3d at 879 (quoting *Bradley*, 528 F.3d at 1115); *see Buckner*, 646 F.3d at 556.

## IV.    DISCUSSION

Mr. McMurry challenges three aspects of the ALJ's decision: (1) substantial evidence does not support the ALJ's RFC; (2) the ALJ should have given the treating physicians' opinions controlling weight; and (3) Grid Rule 201.10 supports an award of benefits. The Court first will discuss the issue of how much weight the ALJ gave to the treating doctor opinions as that issue guides the analysis on the other two challenges raised by Mr. McMurry.

### A.    Assessment of Treating Physician Opinion

"Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Steed v. Astrue,* 524 F.3d 872, 875 (8th Cir. 2008) (quoting *Cox v. Astrue,* 495 F.3d 614, 619 (8th Cir. 2007)).

A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight. . . . A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.

*Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000)(citing *Ghant v. Bowen*, 930 F.2d 633, 639 (8th Cir. 1991) and *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998)). Generally, the opinion of a consulting physician who has examined the claimant only once or only reviewed records is not substantial evidence, nor is the testimony of a vocational expert based on that evidence. *Singh*, 222 F.3d at 452 (quoting *Kelley*, 133 F.3d at 589 and citing *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000)). The ALJ must consider all medical opinions in the record, but give more weight to an opinion if the source examined the claimant, has a treatment relationship with the claimant, is supported by laboratory findings/evidence, and supporting explanations for their opinions. If the ALJ chooses to weigh the opinion evidence differently, the ALJ must explain why he departed from the hierarchical norm. *See Davis v. Schweiker*, 671 F.2d 1187, 1189 (8th Cir. 1982).

Mr. McMurry argues the ALJ should have given controlling weight to the opinions of his treating doctors (Hoch and Hirschl). The Commissioner responds that the ALJ found the treating doctors gave conflicting opinions and properly discounted their opinions. The Court agrees that the ALJ properly evaluated and weighted the various medical opinion evidence in this case and explained the supporting basis.

The ALJ noted that on March 1, 2013, Dr. Hirschl had imposed return-to-work restrictions that included the 15-pound lifting restriction, and avoidance of repetitive lifting, twisting, kneeling, bending, pushing/pulling, or stooping. (Tr. at 32). The ALJ gave this opinion, which would have supported a reduced range of sedentary work, "little weight" because the opinion was given early in the course of Mr. McMurry's treatment and medical evidence since then demonstrated "he has

maintained spinal stability, normal gait/station with ability to ambulate independently, and intact neurological status." (*Id.*) The ALJ also relied on Dr. Hirschl's April 2013 notes, in which Mr. McMurry remained "unchanged in that he continued without neurological deficit and from a neurological standpoint, remained stable with 'stable' thoracic kyphosis." (*Id.*) The ALJ found it notable that Mr. McMurry did not continue to follow-up with Dr. Hirschl after that time. Furthermore, there is support for the ALJ's statement limiting the weight he placed on Dr. Hirschl's opinion in Dr. Hirschl's April 11, 2013 return-to-work note **that listed no restrictions**, including lifting restrictions. (*Id.* at 573).

As for Dr. Hoch, the ALJ found "his treating source opinions are not entitled to controlling and/or significant weight as not well-supported by documented observations, findings, and/or the longitudinal findings." (Tr. at 32-33). Specifically, the ALJ noted that while Mr. McMurry has remained symptomatic with respect to chronic pain, the medical evidence showed "a degree of pain reduction over the courses of treatment" and Mr. McMurry had remained "neurologically intact and stable as far as spinal stability and gait/station are concerned (citing exhibits)." (*Id.* at 33). As of December 18, 2014, at a wellness assessment Mr. McMurry reported no concerns, no symptoms or bothers. (*Id.* at 683). The ALJ also noted Dr. Hoch's opinions were internally inconsistent, citing to Dr. Hoch's February 17, 2015 work capacity assessment to the SSA, in which he agreed with the SSA's assessment of restrictions, including a 20-pound occasional lifting restriction, (*id.* at 696), and his February 27, 2015 assessment on the same form. which recommended a 10-pound lifting restriction based on the neurosurgeon's recommendations as well as an ability to stand or walk only two hours with breaks based on Mr. McMurry's back pain. (*Id.* at 325). The ALJ also found it significant that Dr. Hoch admitted Mr. McMurry was not always fully compliant with treatment, particularly with his diabetes. (*Id.* at 33).

Based on these inconsistencies, the ALJ could refuse to give the opinions of Drs. Hoch and Hirschl controlling weight. *Milam v. Colvin*, 794 F.3d 978, 983 (8th Cir. 2015). "An ALJ may 'discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions.'" *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005)(quoting *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)). Substantial evidence, including the totality of the medical records and the opinions of the two non-examining state agency medical consultants, supports the ALJ's evaluation of the medical opinions and the articulated specific reasons for the limited weight he assigned to the treating doctors' opinions.

B.      **RFC and Substantial Evidence**

In large part based on his analysis of the totality of the medical record, the ALJ concluded the applicable RFC in this case was "light work as defined in 20 C.F.R. 404.1567(b) except [claimant] should no more than occasionally climb, balance, stoop, kneel, crouch, or crawl." (Tr. at 29).  As defined by the regulation

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

The RFC assessment is a medical question that draws support from the medical evidence, as well as other source information, such as the observations of others or the claimant's own description of limitations. *Cox*, 495 F.3d at 619-20. Although based on medical evidence, the RFC is an administrative determination reserved to the Commissioner. *Id.* at 620.

Mr. McMurry complains the RFC failed to "capture the concrete consequences of McMurry's condition – namely, a lifting restriction of 15 pounds, the need for additional breaks to sit or lie down during the workday, and the inability to stand or walk for a total of six hours of an eight-hour day." (Pl. Br. [11] at 23). In response, the Commissioner argues the ALJ correctly considered all the record evidence, not just "selected medical evidence," and the Court should not interpret and reweigh the evidence differently. (Def. Br. [13] at 6).

The ALJ found that Mr. McMurry had sustained injuries in a rollover, single car accident, which included multiple fractures of his thoracolumbar spine at T9, T10, T12, and L1, which after immobilization treatment and physical therapy resulted in a kyphotic deformity and a chronic pain syndrome. (Tr. at 29, citing Ex. 12F). There was also radiographic evidence of disc bulging at L3-4 and right disc herniations at L4-5. (*Id.*, citing Ex. 3F). Dr. Hoch's treatment notes documented Mr. McMurry's course of treatment with formal pain management, although he remained symptomatic. (*Id.* at 30, citing Exs. 4F, 8F, 9F, and 14F). Based on this, the ALJ determined there was a "basis for finding significant work-related limitation of function relative to his spinal injuries and underlying disc disease." (*Id.*) The medical records also demonstrated bilateral hip joint spurring and poorly controlled Type I diabetes, both of which Dr. Hoch's records showed improved with improved compliance with treatment. (*Id.*)

To determine Mr. McMurry's RFC based on these conditions, the ALJ accepted the assessments of the state consulting physicians, noting that, while the physicians in question were

non-treating, non-examining, he accepted their assessments because they thoroughly reviewed the medical records, provided well-reasoned opinions, and the physicians understood agency rules and regulations. (Tr. at 30). Additional evidence submitted since their review, which the ALJ also reviewed, did not show any medical worsening. (*Id.*) *See, e.g.*, Tr. at 645 ("is doing well and has no current complaints" on September 12, 2014), 683 ("Patient expresses no concerns . . . no symptoms/bothers" on December 18, 2014), 688-90 (January 22, 2015: bilateral lower back pain, severe and constant; no leg weakness or numbness; spine range of motion normal; straight leg raising negative to 90 degrees; normal gait and station; x-ray of lumbar spine showed no new deformities noted). Although Dr. Hirschl had imposed a 15-pound lifting restriction on March 1, 2013, two months after surgery, as they were weaning Mr. McMurry from the TLSO brace, by the time of Mr. McMurry's examination on April 11, 2013, Dr. Hirschl noted his gait and station were within normal limits, his joints, bones and muscles were normal on inspection and palpation, and his range of motion was within normal limits. (*Id.* at 556). Dr. Hirschl indicated the patient was neurologically stable and had stable thoracic kyphosis. (*Id.*) Notably, Dr. Hirschl released Mr. McMurry to return to work **with no noted restrictions**. (*Id.* at 573). The ALJ observed that Mr. McMurry did not follow up with Dr. Hirschl any further. By June 2013, Mr. McMurry reported to Dr. Simon, the pain management specialist, he had experienced improvement over time. (*Id.* at 655).

The initial opinion of the first state reviewing consultant, dated September 4, 2013, was based on medical records during Mr. McMurry's twelve-month recovery period from his injury. (Tr. at 107). 42 U.S.C. § 1382c(a)(3)(A)(disability must last more than twelve months); *Barnhart v. Walton*, 535 U.S. 212, 222 (2002)(affirming agency interpretation that "impairment" and "inability" must exceed 12 months). The second opinion, dated December 4, 2013, was towards

the end of Mr. McMurry's twelve-month recovery period and was based on additional medical information showing improvement overall, including Mr. McMurry's  improved compliance with his diabetes medication management. (*Id.* at 120).

The ALJ was entitled to rely on the opinions of the state agency consultants, particularly where, as discussed *supra*, the opinions of the treating physicians contained contradictions. *Casey v. Astrue*, 503 F.3d 687, 694 (8th Cir. 2007). The ALJ did not solely rely on the state consultants' opinions and clearly reviewed all the medical evidence. There is substantial evidence in the record to support the ALJ's RFC determination.

### C.      Grid Rule 201.10

Mr. McMurry's final argument is that Medical-Vocational Rule 201.10, which would have resulted in a finding of "disabled," should have applied as the ALJ incorrectly determined an RFC of "light work" instead of "sedentary."  As discussed above, the ALJ's RFC determination was supported by substantial evidence, therefore, the Grid rules do not apply.

### V.      REPORT AND RECOMMENDATION AND ORDER

After a thorough review of the entire record in accordance with the deferential standard of review, the Court concludes that substantial evidence in the record, when viewed as a whole, supports the ALJ's determination that Mr. McMurry was not disabled within the meaning of the Act. The decision of the ALJ should be affirmed. The undersigned recommends entry of judgment in favor of the Commissioner and against Mr. McMurry dismissing the Complaint.

IT IS ORDERED that the parties have until **August 31, 2017,** to file written objections to the Report and Recommendation, pursuant to 28 U.S.C. § 636(b)(1). *Thompson v. Nix*, 897 F.2d 356, 357 (8th Cir. 1990); *Wade for Robinson v. Callahan*, 976 F. Supp. 1269, 1276 (E.D. Mo. 1997). Any objections filed must identify the specific portions of the Report and Recommendation

and relevant portions of the record to which the objections are made and must set forth the basis for such objections. *See* Fed. R. Civ. P. 72; *Thompson*, 897 F.2d at 357. Failure to timely file objections may constitute a waiver of plaintiff's right to appeal questions of fact. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Griffini v. Mitchell*, 31 F.3d 690, 692 (8th Cir. 1994); *Halpin v. Shalala*, 999 F.2d 342, 345 & n.1, 346 (8th Cir. 1993); *Thompson*, 897 F.2d at 357.

**IT IS SO ORDERED.**

Dated August 17, 2017.

Helen C. Adams
Chief U.S. Magistrate Judge